# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| DERRICK DEON PARRISH, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:13-01218** |
| v. | ) | **Judge Sharp/Brown** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable Kevin H. Sharp, United States District Judge**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq*. For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 14) be **DENIED** and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for SSI on June 7, 2010 (Doc. 12, p. 181)[1] alleging a disability onset date of June 10, 1998 (Doc. 12, p. 133). Plaintiff claimed that he was unable to work due to the residual effects of a gunshot wound to the groin, hypertension, depression, and anxiety. (Doc. 12, p. 81)

Plaintiff's claims were denied initially on December 17, 2010 and again upon reconsideration

---

[1] The page numbers referred to in the SSA Administrative Record (Doc. 12) are the consecutive page numbers that appear in bold in the lower right corner of each page.

on April 21, 2011. (Doc. 12, pp. 75-81, 84-86) Thereafter, on April 26, 2011, plaintiff filed a request for a hearing before an Administrative Law Judge (ALJ). (Doc. 12, pp. 87-89) A hearing was held on July 11, 2012 before ALJ Elizabeth P. Neuhoff. (Doc. 12, pp. 40-74) Vocational expert (VE) Gail A. Ditmore testified at the hearing. (Doc. 12, pp. 67-72)

The ALJ entered an unfavorable decision on July 25, 2012. (Doc. 12, pp. 21-39) Plaintiff filed a request with the Appeals Council on August 27, 2012 to review the ALJ's decision. (Doc. 12, pp. 18-19) The Appeals Council denied plaintiff's request on September 12, 2013, whereupon the ALJ's decision became the final decision of the Commissioner. (Doc. 12, pp. 1-6)

Counsel brought this action on behalf of plaintiff on November 5, 2013. (Doc. 1) Plaintiff filed a motion for judgment on the administrative record on March 14, 2014. (Doc. 14) The Commissioner responded on April 14, 2014. (Doc. 16) Plaintiff filed a reply on April 24, 2014. (Doc. 17) This matter is now properly before the court.

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff was treated at the Vanderbilt University Medical Center on June 10, 1998 for a shotgun wound to the right groin, and he remained hospitalized there until June 17, 1998. (Doc. 12, pp. 202-15) Six months later plaintiff was incarcerated in the Tennessee Department of Correction (TDOC) on a drug related conviction. (Doc. 12, p. 217)

TDOC medical records reveal that plaintiff was assigned to "limited" activity status on December 18, 1998 due to the effects of his gunshot wound. (Doc. 12, p. 289) Plaintiff admitted during a December 29, 1998 TDOC psychological evaluation that he had a history of drug abuse, and that he had been a regular user of marijuana and cocaine prior to his arrest. (Doc. 12, p. 218) Plaintiff's status was changed from "limited" to "medium" on May 18, 2000, and he was cleared by

TDOC to "lift[] 100 lbs. maximum . . . [and to] lift or carry objects weighing up to 50 lbs." frequently. (Doc. 12, p. 286) An x-ray of plaintiff's right foot on August 27, 2002 was unremarkable. (Doc. 12, p. 232) Plaintiff was released from TDOC in 2004. (Doc. 12, p. 52)

Plaintiff presented to the Matthew Walker Comprehensive Health Center ("MWCHC") for hypertension on February 26, 2010. (Doc. 12, pp. 363-71) There is no mention of right lower extremity (RLE) paralysis, pain, limp, weakness, or need of an assistive device to walk in either the part of the record labeled "chronic problems" or "physical exam." (Doc. 12, pp. 364-65)

Plaintiff was evaluated by the Mental Health Cooperative ("MHC") for emotional/mental health issues on July 19, 2010. (Doc. 12, pp. 372-75) A progress note that same date stated that plaintiff "reports a hx of using ETOH [alcohol] and THC [Marijuana]," and that he "la[s]t used ETOH 2 Weeks ago and TCH a month ago." (Doc. 12, p. 374) Although the progress note also states that "C reports he is partial[ly] paralyzed in his right leg," it is silent as to any observed RLE pain, limp, weakness, or need of an assistive device to walk. (Doc. 12, p. 374)

Dr. Marc L. Bennett, M.D., examined plaintiff on September 10, 2010. (Doc. 12, pp. 376-79) Dr. Bennett noted, in part, that plaintiff had: 1) a limp, a weak right leg, and was using a crutch; 2) difficulty getting out of a chair as well as onto and off of the examining table; 3) a medical need for crutches; 4) decreased mobility and ability to grasp and manipulate objects due to his need to handle a crutch; 5) decreased/zero range of motion (ROM) in his right hip, knee, and ankle. (Doc. 12, pp. 377-38) Dr. Bennett concluded his report by writing: "Because of the brevity and scope of this evaluation, I am unable to make a determination about the patient's ability to perform the stated medical tasks." (Doc. 12, p. 379)

Dr. Susan L. Warner, M.D., conducted a physical residual functional capacity (RFC) assessment on October 12, 2010. (Doc. 12, pp. 380-88) Dr. Warner determined, in part, that

plaintiff: 1) was able to lift and/or carry 20 pounds occasionally and 10 pounds frequently; 2) could stand and/or walk at least 2 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday; 3) had limited ability to push and/or pull with his RLE.  (Doc. 12, p. 381)  Dr. Warner also determined that plaintiff did not require assistive devices to walk unless prolonged ambulation, or ambulation over uneven ground, were required.  (Doc. 12, p. 381)  Dr. Warner determined further that plaintiff could never balance or stoop, but that he could occasionally climb, kneel, crouch, and crawl.  (Doc. 12, p. 382)  Dr. Warner concluded by noting that plaintiff's RFC was "reduced to sedentary . . . in consideration of RLE weakness and pain."  (Doc. 12, p. 387)

Plaintiff presented for a psychological evaluation performed by Dr. Thomas L. Pettigrew, Ed.D., on November 16, 2010.  (Doc. 12, pp. 389-93)  Dr. Pettigrew made the specific observation in his report that plaintiff had "no visibly apparent physical abnormalities or problems with gait, balance, or gross motor coordination," that "[h]e did not require use of a cane, walker or other device," and that he "exhibited no pain behavior."  (Doc. 12, p. 389)  Dr. Pettigrew added that plaintiff "appeared to be in no distress while seated in the waiting room . . . ."[2]  (Doc. 12, p. 390)  Dr. Pettigrew also noted that, when he asked plaintiff what/if he drank, plaintiff replied, "'I don't know like beer or some vodka,'" adding that he had "'be[en] trying not drink much now.'"  (Doc. 12, p. 390)  When asked about drugs, plaintiff "denied having ever used or experimented with any illegal substance."  (Doc. 12, p. 390)

Dr. Pettigrew observed in addition to the foregoing that: 1) plaintiff "was alert and oriented to time, place and person," 2) his "clearly articulated speech revealed very accurate vocabulary and syntax skills"; 3) his "responses to numerous questions . . . revealed no deficiencies [in]

---

[2]  That Dr. Pettigrew was aware of plaintiff's physical history is reflected in the following statement in his diagnostic impression: "History of . . . gunshot wound to the right groin."  (Doc. 12, p. 391)

comprehension or . . . ability to organize and express his thoughts"; 4) his "thought was consistently linear and organized"; 5) he "solved mental calculations quickly and accurately"; 6) his "[m]emory functions were . . . intact." (Doc. 12, p. 391) Dr. Pettigrew concluded by noting that, although plaintiff had not undergone psychological testing, he exhibited no cognitive deficits, had an intellectual functioning minimally within the borderline classification (IQ 71-84) based on "his presentation," he was "able to understand, remember and carry out simple verbal instructions," and he exhibited no "[p]roblems with attention, concentration, persistence or tolerance." (Doc. 12, pp. 391-92) Dr. Pettigrew's final diagnostic impression included: "Rule out alcohol abuse versus dependence . . . [and] . . . unspecified drug abuse." (Doc. 12, p. 391) Finally, Dr. Pettigrew noted that plaintiff "was considered an unreliable historian." (Doc. 12, p. 392)

Dr. Fawz E. Schoup, Ph.D., conducted a mental RFC assessment on December 8, 2010. (Doc. 12, pp. 394-411) Dr. Schoup determined that plaintiff had moderate limitations in his ability to: 1) understand and remember detailed instructions; 2) carry out detailed instructions; 3) interact appropriately with the general public; 4) accept instructions and respond appropriately to criticism from supervisors; 5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Doc. 12, pp. 408-09) Dr. Schoup determined that plaintiff was not significantly limited in any other respect evaluated, and that he had "the ability to maintain attention and concentration for 2 hour periods . . . ." (Doc. 12, pp. 408-10)

Dr. Peggy J. Elam, Ph.D., affirmed Dr. Schoup's mental RFC assessment on April 8, 2011. (Doc. 12, p. 412) On April 20, 2011, Dr. Charles S. Settle, M.D., affirmed Dr. Warner's October 12, 2010 physical RFC assessment. (Doc. 12, p. 413)

Plaintiff presented to MWCHC on March 28, 2011 complaining of pain in his right hip and knee. (Doc. 12, pp. 414-17) X-rays were made of both. The "hip joint appear[ed] normal" in the

x-rays.[3]  (Doc. 12, p. 417)

Plaintiff presented to Centerstone Community Mental Health Center (Centerstone) on March 28, 2012 for a psychiatric evaluation.  (Doc. 12, pp. 424-28)  Plaintiff was diagnosed with chronic post-traumatic stress disorder (PTSD).  (Doc. 12, p. 427)  The evaluation was signed by both Dr. Kirk Carruthers, M.D., and Natalie Durr, MSN.  (Doc. 12, p. 428)  Plaintiff's subjective complaints also included "decreased focus." (Doc. 12, p. 424)  However, subsequent Centerstone progress notes characterize his attention as "intact."  (Doc. 12, pp. 420, 422)  Plaintiff admitted that he used to smoke Marijuana, but had not since he was released from prison in 2004.  (Doc. 12, p. 424)  Plaintiff admitted having two to three drinks per month.  (Doc. 12, p. 424)  There is no mention in the evaluation of any apparent physical abnormalities or problems with gate, balance, coordination, or that plaintiff required crutches or assistive devices to ambulate.  (Doc. 12, pp. 424-27)

Nurse Durr completed a mental medical source statement (MSS) on June 20, 2012.  (Doc. 429-30)  The MSS reflects no limitations in plaintiff's ability to understand and remember detailed instructions, or in his ability to carry out either simple or detailed instructions.  (Doc. 12, p. 429)  The MSS reflects moderate limitations in plaintiff's reliability and ability to interact appropriately with the public.  (Doc. 12, p. 429)  The MSS reflects only "mild" limitations in the remaining eleven categories, including plaintiff's ability to "[m]aintain attention and concentration."  (Doc. 12, p. 429)  Nurse Durr did not answer the question in the MSS regarding whether plaintiff's limitations permitted him "to do sustained work-related activities in a work setting on a regular and continuing basis, *i.e.*, 8 hours per day, 5 days per week, or equivalent schedule."  (Doc. 12, ¶ 19, p. 430)  Nurse Durr checked the box labeled "Yes" in response to the question: "Does the individual have evidence of drug addiction and/or alcoholism?"  (Doc. 12, ¶ 22, p. 430)

---

[3]  The results of plaintiff's knee x-rays are not in the record.

## B. Transcript of the Hearing

Plaintiff testified upon questioning by the ALJ that he became disabled on June 10, 1998 when he was shot in the groin. (Doc. 12, pp. 45-46) He was not working at the time of the hearing, but admitted that he had worked the year prior for a couple of weeks washing dishes. (Doc. 12, p. 46) Plaintiff testified that he quit his job washing dishes because his leg would be swollen by the end of the workday. (Doc. 12, p. 47) He had not sought employment since he quit his job (Doc. 12, p. 47), nor had inquired into vocational rehabilitation (Doc. 12, pp. 58-59).

Plaintiff testified that he lived with his mother, and that it "killed" him to go up and down the stairs to his bedroom. (Doc. 12, pp. 48-49) Plaintiff had no income or other source of assistance apart from food stamps. (Doc. 12, p. 58) His mother paid the rent and helped him out financially. (Doc. 12, p. 58) Plaintiff testified that he did not help his mother with any of the household chores,[4] although he was able to make his bed and do his laundry. (Doc. 12, pp. 56-57) Plaintiff watched television most of the day and sometimes walked to the store.[5] (Doc. 12, p. 51)

Plaintiff testified that he did not have a driver's license, but that he drove anyway. (Doc. 12, p. 49) When the ALJ pointed out that driving without a license was illegal, plaintiff attempted to rehabilitate his testimony by telling the ALJ that he only tried to drive "like two times" "like eight or nine months ago," and that he did not "try no more" after he "almost had a wreck."[6] (Doc. 12, pp. 49-50) Plaintiff testified further that he "used to smoke [pot] before [he] went to prison," but

---

[4] Plaintiff wrote in his July 24, 2010 Adult Function Report that he was able to take out the trash and iron. (Doc. 12, p. 164)

[5] Plaintiff wrote in his July 24, 2010 Adult Function Report that he helped get his son ready for school, went outside, and played with the kids. (Doc. 12, p. 163)

[6] Plaintiff wrote in his July 10, 2010 pain questionnaire that he had to drive with two feet. (Doc. 12, p. 159) In his July 24, 2010 Adult Function Report, he wrote that he could not "do the right pedal w/o moving [his] leg with [his] hand," noting in the same report that he did not have a driver's license. (Doc. 12, p. 165)

that he had not smoked since being released in 2004.  (Doc. 12, pp. 51-52)  He testified that he was in prison for "[d]rug possession."  (Doc. 12, p. 52)

Plaintiff testified that he was able to stand "probably 20 or 30 minutes before [his leg] start[ed] hurting" but, if he stood longer than that, his leg would "start swelling" and he would have to "sit down or lay down."  (Doc. 12, p. 55)  When the ALJ reminded him that he previously testified he walked to the store, plaintiff clarified that the store was "right across the street" from his mother's house, and he usually tried "to send somebody . . . like one of [his] little cousins or something.  But . . . if there ain't nobody there, [he would] . . . just . . . tough it out."  (Doc. 12, p. 55)  Plaintiff testified that he could probably walk a block, but he would "start tightening up and stuff" if he did. (Doc. 12, p. 55)  Plaintiff also testified that he had difficulty staying focused.  (Doc. 12, p. 58)

Upon questioning by counsel, plaintiff testified that he was classified as "complete bed rest and no continuous strenuous activity" when he was first incarcerated in TDOC, but that he was later cleared for "medium work."  (Doc. 12, p. 59)  Plaintiff denied that his work classification changed because his leg had improved.  (Doc. 12, p. 60)  Plaintiff testified that he "was in a one man cell and [that he] told them . . . [he] wanted to get out . . . of th[e] cell, so [he could] go . . . outside and . . . sit in the yard and stuff."  (Doc. 12, p. 60)  Although plaintiff denied ever working in prison, he admitted that he had worked as a machine operator and general laborer after he got out of prison.[7] (Doc. 12, p. 60)  Plaintiff claimed that he was unable to do those jobs any longer because his leg had gotten worse.  (Doc. 12, p. 60)

---

[7]  Plaintiff's August 10, 2010 Work History Report shows that he worked after his incarceration as a industrial machine operator from February 2004 to March 2005, as carpet and flooring general laborer from March 2007 to June 2008, and again as an industrial machine operator from July 2008 to August 2009.  (Doc. 12, p. 170)  As a machine operator, plaintiff "[a]djusted machine settings with hands according to speed and size of products," "[i]nserted bag[s] in feeder[s] . . . [t]hreaded . . . wire through machines . . . [and] . . . [l]ifted small object[s] of wire to feed reels to machine . . . as often as needed."  (Doc. 12, pp. 171, 173)  As a general laborer, plaintiff "cut and shaped fiberglass sheets with hand tools . . . used tools to install duct work," and lifted/carried "[h]and tools . . . to [the] work area . . . as needed."  (Doc. 12, p. 172)

Plaintiff testified that he sought treatment at MHC because he was "kind of like messed up for a minute" following his father's suicide and the death of two of his friends. (Doc. 12, p. 61) He explained that MHC referred him to Centerstone because he did not have insurance. (Doc, 12, pp. 61-62) Plaintiff also testified that he was treated at MWCHC in March 2011 for leg pain. (Doc. 12, p. 62) Although MWCHC gave him a "painkiller," plaintiff testified that he was unable to afford the medication on his own. (Doc. 12, pp. 62-63) Plaintiff confirmed that Centerstone prescribed Trazodone and Cirslopram for his mental/psychological issues. (Doc. 12, p. 63) Although these medications helped him sleep, they did not help him otherwise. (Doc. 12, p. 63)

Counsel asked plaintiff to "tell the judge about [his] ability to concentrate . . . and . . . ability to focus." (Doc. 12, p. 63) Plaintiff replied as follows:

> Like I'll watch TV and . . . I can't focus. It's like I'll be . . . looking straight at the TV and I don't know what's going on, because my mind done went somewhere else. Or . . . if I'm having a conversation with somebody . . . I don't remember . . I don't hear nothing they [are] saying until they be like, you hear me. And I'll be like, yeah. And I'll be wanting to ask them again, like what you just say. But, sometimes it's embarrassing, because I'm looking at the person, you know.

(Doc. 12, pp. 63-64) Plaintiff disagreed with Nurse Durr's opinion in the MSS that he had only a mild impairment in his ability to remember, to do simple things and to concentrate. (Doc. 12, p. 64)

Plaintiff testified that Centerstone had diagnosed him with PTSD resulting from his gunshot wound. (Doc. 12, p. 64) He claimed to have recurring nightmares of the shooting, and dreamed that it was happening all over again. (Doc. 12, pp. 64-65) He also testified that, when he awoke to the sound of gunshots, he would be in a "cold sweat," "real tired," and have to change his clothes because they were "soaking wet . . . like [he had] been running for something." (Doc. 12, p. 65)

Plaintiff, who appeared at the hearing with a cane, testified that it depended on how much walking he did whether he needed it, but that he usually took it with him when he went out in public. (Doc. 12, pp. 65-66)  Plaintiff testified that he needed the cane for balance and because sometimes he was unable to lift his foot which caused him to "trip over stuff and . . . fall sometime[s]."  (Doc. 12, p. 66)  He testified further that he needed the cane or something else to lean on when he bent over.  (Doc. 12, p. 66)  Plaintiff concluded that he was unable to crouch, crawl, or get up easily. (Doc. 12, p. 66)

After counsel concluded her examination of plaintiff, the ALJ posed the following hypothetical to the VE:

> Let's assume a person that has the claimant's age, educational background and work experience. . . .  This person: can lift or carry 20 pounds on occasion and ten frequently; stand and walk two to five hours total each [day]; sit six hours total; can never climb or balance; can perform no work requiring fine visual acuity, such as bead work or sewing; this person can perform no work around work place hazards; and is further limited to simple work consisting of occasional contact with the general public; can work only related contact with coworkers and supervisors.  Would this hypothetical allow for any past work?"

(Doc. 12, pp. 67-68)  The VE answered, "It would not, Your Honor."  (Doc. 12, p. 68)

The ALJ then asked the VE whether there were any jobs that could be performed given these limitations.  (Doc. 12, p. 68)  The VE replied that the hypothetical provided for "light" work as a "machine tender," "production worker," and "packer," and that all three positions existed in significant numbers in both the national and local economy.  (Doc. 12, p. 68)

Drawing the VE's attention to the MSS completed by Nurse Durr, the ALJ added the following to the basic hypothetical above:

> Remember everything that I just gave you, except that this person would be unable to focus or concentrate for periods of longer than 30 minutes at a time.  So . . . in addition to everything I gave you in hypothetical number one, if I further limited it to that, what would happen to the jobs in the economy?

(Doc. 12, p. 69)  The VE replied, "Those jobs would not be available nor do[] I know any that would be available.  [The] [l]abor market . . . would be totally eroded."  (Doc. 12, p. 69)

Counsel then questioned the VE.  Referring to Dr. Warner's October 12, 2010 physical RFC, counsel noted that Dr. Warner concluded that plaintiff could stand at least two hours in an eight-hour workday, whereas the ALJ had used two to five hours in his hypotheticals.[8]  (Doc. 12, p. 69)  When asked if this apparent discrepancy made any difference, the VE replied that the light jobs he identified would not be available, but the full range of sedentary work would be.  (Doc. 12, pp. 69-70)  The VE testified further that plaintiff's use of a cane would not have any affect on sedentary work that was available.  (Doc. 12, p. 70)  The VE also noted that, if plaintiff had "to lie down during the day in order to relieve his pain," no work would be possible.  (Doc. 12, p. 70)

On reexamination by the ALJ, the VE reiterated that, based on the stand/walk change identified by counsel, *i.e.*, that plaintiff was limited to walking/standing 2 hours in an 8-hour workday, substantial employment existed at the sedentary level as "production workers," "packers," and "office clerks."  (Doc. 12, p. 71)  The VE testified further that "office clerk" job "automatically ha[d] a sit/stand option," and that both "general production workers" and "packers" had sit/stand options as well.  (Doc. 12, p. 71)

Upon reexamination by counsel, the VE testified that the sit/stand option was for "brief

---

[8]  The ALJ's 2-5 hour stand/walk limitation appears to have been based on the Vocational Consultants' assessments made on December 17, 2010 and again on April 20, 2011.  (Doc. 12, pp. 178, 188)

change of position," and did not include those who "needed more than five or ten minutes . . . ." (Doc. 12, p. 72)  The VE concluded his testimony by noting that even sedentary work would not be available if someone were "unable to focus longer than 30 minutes at a time."  (Doc. 12, p. 72)

## C. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905.  Corresponding regulations outline the five-step sequential process described below to determine whether an individual is "disabled" within the meaning of the Act.

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.

> Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.

> Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, then he is deemed disabled.

> Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform his past relevant work, in which case the claimant is not disabled.

> Fifth, the ALJ determines whether, based on the claimant's RFC, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548

(6th Cir. 2004)(internal citations omitted); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). The claimant bears the burden of proof at steps one through four. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). The burden then shifts to the Commissioner at step five "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

The SSA's burden at the fifth step may be met by relying on the medical-vocational guidelines, known in the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics in the applicable grid rule. *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253 at *4 (SSA)). In determining the claimant's RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *see Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

A review of the record shows that the ALJ followed the required five-step process. Plaintiff does not allege that she did not.

## III. ANALYSIS

### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining

whether the findings of fact are supported by substantial evidence in the record, and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Key v. Callahan* 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). In other words, if the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. 42 U.S.C. §§ 405(g), 1383(c); *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *see also Key*, 109 F.3d at 273.

**B. Claims of Error**

**1. Whether the ALJ Erred in Determining that
Plaintiff Could Perform Light Work
(Doc. 15, ¶ 1, pp. 8-9)**

Plaintiff argues that the ALJ erred in determining that he can perform light work given that he can stand/walk only 2 hours in an 8 hour day. Plaintiff argues that "[a] more appropriate RFC would have been . . . a RFC of sedentary work . . . ." (Doc. 15, p. 9)

The regulation that describes sedentary and light work is quoted below in relevant part:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria

14

are met.

20 C.F.R. § 404.1567(a).

> Light Work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, **or** when it involves sitting most of the time with some pushing and pulling of arm **or** leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. . . .

20 C.F.R. § 404.1567(b)(emphasis added). The SSA regulations define RFC as "the **most** [the claimant] can still do despite . . . limitations . . . based on all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1)(emphasis added).[9]

As shown above, light work does not <u>mandate</u> "a good deal of walking or standing," light work also includes jobs that involve "sitting most of the time with some pushing and pulling of arm or leg controls." There is nothing in the record that shows plaintiff is unable to use his arms and/or hands. Therefore, plaintiff's RFC to perform light work is properly based on his ability to sit most of the time, pushing and pulling arm/hand controls. Because light work is the most plaintiff can do despite his limitations, the regulations required the ALJ to conclude that plaintiff had the RFC to perform light work. This claim of error is without merit.[10]

---

[9] Plaintiff also cites to POMS (Social Security Programs Operations Manual) 250001.0001(A)(23). "[A]lthough internal manuals like POMS . . . might provide some evidence of the SSA's interpretations of its regulations," while constituting persuasive authority, *see e.g., Drombetta v. Sec. of Health & Human Servs.*, 845 F.2d 607, 609 (6th Cir. 1987), they do not trump the SSA's published regulations where there is no ambiguity, *see e.g., Ferriell v. Comm'r of Soc. Sec.*, 614 F.3d 611, 618 (6th Cir. 2010).

[10] Although not entirely clear, it appears that plaintiff also argues the ALJ erred by giving Dr. Warner's opinion "great weight," but then disregarding her opinion that plaintiff was limited to sedentary work. Plaintiff has not provided law and argument in support of this possible argument. Because this apparent argument is conclusory, the Magistrate Judge will not address it.

### 2. Whether the ALJ Erred in Determining that Plaintiff
### Plaintiff Could Both Occasionally
### Balance and Never Balance
### (Doc. 15, ¶ 2, p. 9)

Plaintiff asserts that "[t]he ALJ found that Mr. Parrish could BOTH occasionally balance and never balance (Tr. 28)." Plaintiff argues that remand is required for clarification.

The part of the ALJ's decision to which plaintiff refers is the RFC paragraph <u>heading</u> where it is written that plaintiff can "occasionally climb ramp/stairs, balance, stoop, kneel, crouch, and crawl; never climb latter/rope scaffolds and balance . . . ." (Doc. 12, ¶ 4, p. 28) Since plaintiff cannot balance occasionally and never at the same time, one or the other is wrong.

As noted in plaintiff's first claim of error, the ALJ accorded "great weight" to Dr. Warner's physical RFC assessment. (Doc. 12, p. 32) In the paragraph where she discusses Dr. Warner's opinion, the ALJ correctly summarizes Dr. Warner's opinion that plaintiff could "occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl," but that he could "never climb latter/rope/scaffolds and balance." (Doc. 12, pp. 32, 382) A plain reading of the ALJ's decision reveals that the RFC assessment also was based on the VE's testimony at the hearing. (Doc. 12, p. 34) As noted above at p. 10, the VE's testimony at the hearing was based on a never-balance restriction. (Doc. 12, p. 67)

It is obvious from the foregoing that the error here is typographical one, and that the ALJ's RFC determination actually was based on a never-balance limitation. The record supports the further conclusion that ALJ's RFC determination, discussed above at pp. 14-16, was supported by substantial evidence. Finally, plaintiff has not alleged or shown that, but for this typographical error, the outcome of his case would have been different. This claim of error is without merit.

### 3. Whether the ALJ Erred in Not Clearly Determining that

**Plaintiff Could Never Balance**
**(Doc. 15, ¶ 3, pp. 9-11)**

Plaintiff asserts that the ALJ erred by "fail[ing] to find clearly that Mr. Parrish could never balance (Tr. 28)." (Doc. 15, p. 9) Citing SSR 96-9p, *Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work – Implications of a Residual Functional Capacity for less than a Full Range of Sedentary Work*, plaintiff argues first that the ALJ's "light" RFC was "inaccurate," but even if it were correct, he still would able to "stand/walk for [only] 2 hours out of 8 hours." (Doc. 15, pp. 10-11) Plaintiff contends that, because he could never balance during those 2 hours, he would present "a hazard[] . . . for both himself and his co-workers and subject the employer to liability" which, in turn, would run contrary to Dr. Warner's opinion that he "he should avoid even moderate exposure to hazards." (Doc. 15, p. 11)

Plaintiff's argument that the ALJ's "light work" determination was "inaccurate" already has been decided in favor of the Commissioner. Plaintiff's reliance of SSR 96-9p also is unavailing. SSR 96-9p pertains to an RFC determination of less than a full range of sedentary work. Plaintiff's RFC is "light" – not "sedentary." Finally, the hazards to which Dr. Warner refers are environmental in nature such as "machinery, heights, etc." (Doc. 12, p. 384) Environmental "hazards" do not include one's self. This claim of error is without merit.

**4. Whether the ALJ Erred in Not Stating the Weight**
**Given to Dr. Bennett's Findings**
**(Doc. 15, ¶ 4, pp. 11-12)**

Plaintiff argues that the ALJ erred in not specifying the weight given to Dr. Bennett's report. Dr. Bennett's report is addressed above at p. 3. Plaintiff argues further that "[t]he ALJ should have adopted Dr. Bennett's findings and added [them] to the residual functional capacity," the inference being that Dr. Bennett's report should have trumped Dr. Warner's.

17

The record shows that ALJ discussed Dr. Bennett's findings in detail in the RFC analysis. (Doc. 12, p. 29)  The only part of Dr. Bennett's report that the ALJ did not mention was his statement that, "[b]ecause of the brevity and scope of this evaluation, I am unable to make a determination about the patient's ability to perform the stated medical assessment tasks."  (Doc. 12, p. 379)  The record also shows that the ALJ did not specify the weight given to Dr. Bennett's opinion.

Medical opinions are weighed by the process set forth in 20 C.F.R. § 404.1527(c).  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).  As a general rule, an opinion from a medical source who has examined a claimant is entitled to more weight than an opinion from a source who has not performed an examination ("non-examining source"), and an opinion from a medical source who regularly treats the claimant ("treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship ("nontreating source").  *Gayheart*, 710 F.3d at 375 (citing 20 C.F.R §§ 404.1502 and 404.1527(c)(2)).

Under the regulations, Dr. Bennett, who actually examined plaintiff, is a "non-treating, examining source," whereas Dr. Warner, who did not examine plaintiff, is a "non-treating, non-examining source."  Therefore, all things considered equal, Dr. Bennett's opinion should have carried more weight than Dr. Warner's.  Although it is obvious that the ALJ gave Dr. Warner's opinion greater weight than Dr. Bennett's, the ALJ was not required to explain why she gave less weight to Dr. Bennett's.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514-15 (6th Cir. 2010).  Moreover, as shown below, the ALJ's decision to give Dr. Warner's opinion greater weight than Dr. Bennett's is supported by substantial evidence.

Dr. Bennett's examination portrayed plaintiff as a man with significant limitations.

However, as noted above at p. 3 , Dr. Bennett's examination was limited in time and scope. Moreover, as noted above at p. 3, there is no mention in the MWCHC records – just a few months prior to Dr. Bennett's examination – that plaintiff exhibited RLE paralysis, pain, limp or weakness or need to use a crutch or cane. As previously noted at p. 3, MHC records dated less than two months before Dr. Bennett's examination are silent on this point as well. As noted above at p. 4, Dr. Pettigrew specifically wrote two months after Dr. Bennett's examination that plaintiff exhibited "no visibly apparent physical abnormalities or problems with gait, balance, or gross motor coordination . . . [h]e did not require use of a cane, walker or other device . . . [he] exhibited no pain behavior . . . and [he] appeared to be in no distress while seated in the waiting room . . . ." As noted above at pp. 5-6, four months after Dr. Bennet's examination, x-rays showed that plaintiff's hip joint appeared to be normal. Finally, as noted above at p. 6, there is nothing in the Centerstone records that suggests that plaintiff exhibited had any of the physical problems alleged. This claim of error is without merit.

### 5.  Whether the ALJ Erred in not Adding a Sit/Stand Option to Her RFC Determination (Doc. 15, ¶ 5, pp. 12-13)

Plaintiff argues that the ALJ erred in not adding a sit/stand option to the RFC determination. The record shows that the ALJ did not include a sit/stand option. (Doc. 12, p. 28)

The ALJ's RFC determination was based on Dr. Warner's physical RFC assessment. Dr. Warner's assessment did not include the requirement for a sit/stand option. In any event, as established above at p. 12, the jobs on which the ALJ based the denial of benefits, *i.e.*, production worker, packer, and office clerk (Doc. 12, p. 34), all had a sit/stand options. This claim of error is without merit.

### 6.  Whether the ALJ's Decision Erroneously Recites the VE's

### Testimony Regarding the Sit/Stand Option
### (Doc. 15, ¶ 6, p. 14)

Plaintiff claims that the ALJ misstated the VE's testimony pertaining to sit/stand options. Plaintiff argues that the VE actually testified that the sit/stand option was for "brief changes of position," and would "not necessarily allow for someone who needed to alternate positions for more than five or ten minutes."

The ALJ wrote the following in her opinion pertaining to the VE's testimony on the sit/stand option at issue: "The vocational expert testified that these jobs would also allow for a sit-stand option." (Doc. 12, p. 34) The record shows that the VE did, in fact, testify that the jobs on which the ALJ based the denial of benefits all have sit/stand options. (Doc. 12, p.71)

Plaintiff also takes the VE's testimony out of context. The testimony at issue was given in response to counsel's hypothetical, not to facts in evidence. (Doc. 12, p. 72) More particularly, apart from plaintiff's testimony at the hearing that he could only sit for 30 minutes before having to stand, and could stand for only 20 minutes before having to sit (Doc. 12, pp. 54-55), there is no medical evidence in the record, objective or otherwise, that establishes plaintiff can stand for only 20 minutes, that he has to alternate positions frequently, or that he requires five to ten minutes between positions before being able to resume work. This claim of error is without merit.

### 7. Whether the ALJ' RFC Determination
### is Incomplete and Inaccurate
### (Doc. 15, ¶ 7, pp. 14-17)

Plaintiff argues that the ALJ did not take into consideration that he was unable to focus for more than 30 minutes at a time, or include all of his mental/emotional impairments, in the RFC

determination.[11]  (Doc. 15, p. 14)  Plaintiff also argues that the ALJ failed to find that PTSD was a severe impairment even though Dr. Kirk Carruthers and Nurse Durr at Centerstone diagnosed him with PTSD.  (Doc. 15, pp. 14-15)  Although not entirely clear, it appears that plaintiff also argues that the ALJ failed to mention Dr. Carruthers at all, or give due consideration to the MSS completed by Nurse Durr, addressed above at pp. 6-7.  Lastly, plaintiff argues that the ALJ erred in determining that polysubstance dependence was a severe impairment.  (Doc. 15, p. 17)

The ALJ noted the following with respect to plaintiff's alleged inability-to-focus: "The claimant endorsed . . . diminished ability to focus . . . ."  (Doc. 12, p. 30)  As previously noted at p. 6, plaintiff represented at his March 28, 2012 psychiatric evaluation at Centerstone that he had "decreased focus."  As noted above at pp. 8-9, plaintiff also testified at the hearing that he was unable to stay focused.

Apart from plaintiff's subjective complaints at Centerstone, and his testimony at the hearing, there is no evidence in the record that supports plaintiff's claim that he cannot remain focused for more than 30 minutes. On the other hand, as noted above at p. 5, Dr. Schoup, whose report the ALJ accorded "significant weight," determined that plaintiff's ability to maintain attention and concentration was not significantly limited, and that he had "the ability to maintain attention and concentration for 2 hour periods . . . ."  Dr. Pettigrew, as noted above at p. 5, also reported that plaintiff had no "[p]roblems with attention, concentration, persistence or tolerance."  As noted above at p. 6, Centerstone progress notes characterize plaintiff's attention as "intact" following his initial psychiatric evaluation.  Finally, as noted above at p. 6, Nurse Durr observed in the MSS that plaintiff

---

[11]  Plaintiff's argument that the ALJ included some of his mental/emotional limitations but not others lacks specificity. Plaintiff does not identify the mental/emotional limitations to which he is referring, he does not provide any references to the record where these unspecified limitations are addressed, nor does he provide law and/or argument in support of this part of his claim of error.  Because this part of the claim of error is conclusory, and the Magistrate Judge will not address it.

had only mild limitations in his ability to "[m]aintain attention and concentration."

The ALJ's decision not to consider plaintiff's subjective claim that he cannot remain focused for more than 30 minutes in the RFC assessment is supported by substantial evidence. This argument is without merit.

Plaintiff argues next that the ALJ failed to include PTSD as a severe limitation, even though Dr. Carruthers and Nurse Durr diagnosed him with PTSD. The record shows that the ALJ did not include PTSD as a severe impairment in her decision. (Doc. 12, ¶ 2 p. 26) The ALJ referred to PTSD only as follows: "The claimant presented to Centerstone . . . on March 28, 2012. . . . The impression was posttraumatic stress disorder. . . ." (Doc. 12, p. 30)

The record shows that the PTSD diagnosis was based solely on plaintiff's subjective complaints rendered at a one-time, one-hour psychiatric evaluation at Centerstone on March 28, 2012. (Doc. 12, p. 424) Apart from plaintiff's subjective complaints at Centerstone, and his testimony at the hearing (Doc. 12, p. 64), there is no objective medical evidence in the record that supports a PTSD diagnosis.

As for Dr. Carruthers, the record shows that the ALJ did not mention him by name anywhere in the decision. Little wonder. Although Dr. Carruthers signed the March 28 psychiatric report (Doc. 12, p. 428), there is no evidence that he actually participated in that evaluation. Nurse Durr is listed as the clinician. (Doc. 12, p. 424) Moreover, although Dr. Carruthers' name appears repeatedly in the Centerstone records, apart from the March 28 psychiatric evaluation, his name appears only as Nurse Durr's supervisor, and then solely for the purpose of dispensing medications. (Doc. 12, pp. 420, 422)

For the reasons explained above, Dr. Carruthers does not qualify as a "treating physician"

whose PTSD diagnosis would be entitled to controlling weight. Even assuming for the sake of argument that he actually participated in plaintiff's psychiatric evaluation, Dr. Carruthers is – at best – a non-treating, examining source whose PTSD diagnosis is not entitled to any special deference.

As for Nurse Durr, the ALJ addressed the fact that she completed the MSS on June 20, 2012, but not that she diagnosed plaintiff with PTSD. (Doc. 12, p. 33) As noted above, the record is devoid of any objective medical evidence that plaintiff suffers from PTSD. Moreover, the Centerstone records show that Nurse Durr saw plaintiff only twice after the psychiatric evaluation, each time for 15 minutes, and each time her impressions were based on plaintiff's subjective representations. (Doc. 12, pp. 420, 422) Finally, as shown below, Nurse Durr is not an "acceptable source" and, as such, her opinion is merely "other evidence" that the ALJ should consider.

For the reasons explained above, plaintiff's PTSD argument is without merit as to both Dr. Carruthers and Nurse Durr.

Next, plaintiff argues that the ALJ failed to consider the MSS completed by Nurse Durr in which she determined that he "had a moderate impairment both in demonstrating reliability and interacting appropriately with the public . . . [and] . . . that his functional limitations had lasted for at least 12 years." This argument is sandwiched in the middle of plaintiff's PTSD argument. To the extent that plaintiff intended this to be part of his PTSD argument, it is moot for reasons explained above. To the extent that plaintiff intended it to be a stand-alone argument, it is addressed below.

The ALJ addressed Nurse Durr's MSS in the RFC analysis. (Doc. 12, p. 33) The ALJ noted that Nurse Durr's assessment reflected that plaintiff had "moderate limitations . . . in [his] ability to demonstrate reliability and interact appropriately with the public . . . ." The ALJ concluded in the RFC assessment that "[t]he opinion of Nurse Durr has been considered and is accorded weight insofar as it is consistent with the residual functional capacity . . . above . . . ."

As noted above at p. 23, Nurse Durr is not an "acceptable medical source." Acceptable medical sources who/that may provide evidence to establish an impairment are "licensed physicians (medical or osteopathic doctors)" and "[l]icensed or certified psychologists." 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). "Other sources" such as nurse practitioners, physicians' assistants, nurses, therapists, etc., may provide evidence only as to the severity of an impairment and how it affects the ability to work. 20 C.F.R. §§ 404.1513(d)(1) and 416.913(d)(1). Nurse Durr is an "other source" and, as such, the ALJ only was required to consider her opinion as "other evidence." *See Cruse*, 502 F.3d at 541. That is precisely what the ALJ did. (Doc. 12, p. 33) This argument is without merit.

Finally, plaintiff argues that the ALJ erred in determining that polysubstance abuse constituted a severe impairment, because Dr. Pettigrew's impression, noted above at p. 5, conflicts with that determination.

Dr. Pettigrew's November 2010 evaluation, addressed above at pp. 4-5, was based on plaintiff's subjective inputs that he consumed alcohol "'just occasionally' . . . 'like beer or some vodka," but he had "been trying not to drink much now," and that he had "[n]ever used or experimented with any illegal substance." These two statements led to Dr. Pettigrew's diagnostic impressions at issue: "Rule out alcohol abuse versus dependence . . . [and] . . . unspecified drug abuse."

As noted at p. 2 above, plaintiff admitted in the December 1998 TDOC psychological evaluation to "a history of drug abuse, stating that he was a regular user of marijuana and cocaine prior to his arrest." Just four months prior to Dr. Pettigrew's evaluation, as noted above at . 3, plaintiff admitted to MHC in July 2010 to "ha[ving] a hx of using ETOH and THC . . . and . . . report[ed] he la[s]t used ETOH 2 weeks ago and THC a month ago." As noted above at p. 6, during

his March 2012 Centerstone psychiatric evaluation, plaintiff admitted to a history of THC and ETOH use. As noted above at p. 6, Nurse Durr checked the box labeled "Yes" in response to the question posed in the June 2012 MSS, "Does the individual have evidence of drug addiction and/or alcoholism?" Finally, as noted above at p. 8, plaintiff testified at the July 2012 hearing that he previously smoked Marijuana.

Substantial evidence supports the conclusion that plaintiff was not forthright with Dr. Pettigrew, a conclusion supported by Dr. Pettigrew's observation that he "considered [plaintiff] an unreliable historian." Substantial evidence also supports the conclusion that plaintiff was not forthright with others on the matter of whether he used drugs and/or alcohol, and when he last used them. This same substantial evidence supports the ALJ's determination that plaintiff's polysubstance issues constituted a severe impairment. This argument without merit.

### 8. Whether the ALJ Wrongfully Determined that Plaintiff's Testimony Was Not Fully Credible (Doc. 15, ¶ 8, pp. 17-20)

Plaintiff couches this claim of error first in terms of Dr. Bennet's report, arguing that Dr. Bennett did not question plaintiff's credibility.[12] Plaintiff also argues without explanation that his "severe injury to his groin area and his obesity . . . supports his credibility and testimony regarding his limitations." Plaintiff also appears to allege error because the ALJ determined that plaintiff's obesity was a severe impairment, but "[d]id not discuss it again." Finally, plaintiff argues that the fact that he sought treatment for pain when he worked as a dishwasher supports his credibility."

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor

---

[12] Plaintiff raises this claim of error solely in the context of his alleged physical restrictions/limitations. He does not mention his alleged mental/psychological restrictions/limitations.

and credibility." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 654 (6th Cir. 2009)(quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). An ALJ's credibility assessment will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The Sixth Circuit has "held that an administrative law judge's credibility findings are virtually 'unchallengeable.'" *Ritchie v. Comm'r of Soc. Sec.*, 540 Fed.Appx. 508, 511 (6th Cir. 2013)(quoting *Payne v. Comm'r of Soc. Sec.*, 402 Fed.Appx. 109, 112-13 (6th Cir. 2010)). That said, however, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm's of Soc. Sec.*, 437 Fed.Appx. 370, 371 (6th Cir. 2011)(quoting *Walters*, 127 F.3d at 531).

Plaintiff portrayed himself at the July 2012 hearing as someone who suffered such disabling physical limitations that he was incapable of doing even the most menial tasks, relying instead on his mother, family, and friends to do many things for him. However, substantial evidence in the record supports that conclusion that such claims were not credible. As noted above at pp. 2-3, TDOC medical records show that plaintiff's status was changed from "light" to "medium" as early as Mary 2000, with clearance to lift up to 100 lbs. and lift/carry 50 lbs. frequently. As noted above at pp. 8-9 & n. 7, the record shows that plaintiff was employed as industrial machine operator and general laborer during the five years subsequent to his release from TDOC, and that he worked as a dishwasher the year prior to the hearing. Substantial evidence also supports the conclusion that plaintiff presented physically disabling behavior when it suited his purpose. As previously noted at pp. 3 and 6, plaintiff's alleged physical limitations were conspicuously absent in the MWCHC, MHC, and Centerstone records. As previously noted at p. 4, Dr. Pettigrew's specific observations in November 2010 directly contradict plaintiff's claim that he has disabling physical limitations. As previously noted at p. 7 & nn. 4-5, plaintiff reported to the SSA field office in July 2010 that he helps get his son ready for school, that he goes outside, that he plays with the kids, that he is able

to take out the trash and iron his clothes, and that he is able to shop. (Doc. 12, pp. 163-65) Finally, as noted above at pp. 5-6, the March 2011 x-rays taken at MWCHC showed that plaintiff's right hip appeared "normal."

Plaintiff's reliance on Dr. Bennett's September 2010 examination is unavailing. Not only does Dr. Bennett's opinion not trump the substantial evidence delineated above, the value of Dr. Bennett's opinion is significantly diminished by brevity and limited scope of his examination. This claim of error is without merit.[13]

### 9. Whether the ALJ's Decision is Supported by Substantial Evidence (Doc. 15, ¶ 9, p. 20)

Plaintiff argues in his final claim of error that, "[i]n view of all the errors recited above, it is clear that the decision is not supported by substantial evidence." The Magistrate Judge has determined that none of plaintiff's prior claims constitute error. Accordingly, plaintiff's claim of error here is without merit.

### IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 14) be **DENIED** and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a

---

[13] Plaintiff's lack of veracity about his drug use, discussed above at pp. 25-26, further contributes to the substantial evidence that supports the ALJ's credibility determination.

copy thereof.  Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal.  *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

      **ENTERED** this 15th  day of August, 2014.

/s/ Joe B. Brown_____
Joe B. Brown
United States Magistrate Judge